UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------x
ADAM BERK, individually, and as an assignee,

                    Plaintiff              06 Civ. 2716 (LLS)
                                           Opinion and Order

            v.

MOORE, CLAYTON & CO., INC., and its
subsidiary, MCC FIANCIAL SERVICES,

                    Defendants.
-------------------------------------------x

     Defendants move to dismiss the amended complaint pursuant

to Fed. R. Civ. P. 12(b)(1) for lack of subject matter

jurisdiction, and pursuant to Fed. R. Civ. P. 12(b)(6) for

failure to state a claim upon which relief can be granted.

     For the reasons that follow, the Court finds that the

plaintiff has sufficient standing to support jurisdiction over

the assignors' claims, and that the amended complaint adequately

states claims on which relief can be granted, except for the

third claim for negligence and negligent misrepresentation.


                            BACKGROUND

     Plaintiff brings this action on behalf of himself and

twelve assignors against Moore, Clayton & Co., Inc. ("Moore

Clayton") and its subsidiary, MCC Financial Services ("MCC

Financial"), a consulting and private equity services firm hired

by Centurion Gold Holdings, Inc. ("Centurion").  The following

allegations are taken from the amended complaint and are accepted as true on this motion to dismiss.  See Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993).

Centurion is a South African gold firm whose shares are publicly traded in the United States.  Am. Cmplt. ¶ 6.  On April 4, 2005 Centurion announced that MCC Financial would represent Centurion in its effort to raise its visibility among investors. Id. at ¶ 7.  In exchange for its services, defendants[1] received 300,000 shares of Centurion common stock.  Id. at ¶ 8.

On June 27, 2005, defendants issued a press release announcing that Centurion's Board of Directors was considering an offer for the purchase of Centurion at 45¢ per share, more than twice its closing price of 22¢ per share on June 24, 2005. Id. at ¶ 10.  Defendants issued another press release on July 14, 2005 announcing that the competition to purchase Centurion had intensified, with several bids reaching $1.00 per share. Id. at ¶ 11.  Plaintiff alleges that as a result of these press releases, investors purchased shares, or did not sell shares, of Centurion.  Id. at ¶ 12.

On August 1, 2005 defendants issued a press release stating that

---

[1] The amended complaint usually refers to "defendants" without distinction between MCC Financial and its parent Moore Clayton.  Plaintiff claims they operate as a single entity.  Am. Cmplt. ¶ 28.

Centurion Gold Holdings, Inc. (OTCBB:CGHI – News), the only South African junior gold mining company publicly listed in the U.S., announced today that it has signed an irrevocable agreement with a UK listed company for such company to bid to purchase 100% of the common stock of Centurion for consideration equal to $0.60 per share with a value of approximately $151.1 million on a fully diluted basis.  After careful review of several offers, Centurion's Board accepted an offer from a company that it felt provides the most synergy and maximization for the value of the company's assets.  Consideration in accepting the offer involved available working capital, maintaining control of the Company and the access to capital for future projects. CEO Dale Paul, will join the new company as President. It is anticipated that a formal bid, with more details, will be submitted to Centurion's shareholders within the next few weeks.  The buyout is intended to be completed before the end of the year and listed on the London AIM market.[2]

Id. at Ex. F.  Following the August 1, 2005 press release, the market price of Centurion's stock rose from approximately 30¢ to 40¢ per share in one day.  Id. at ¶ 14.  Plaintiff alleges that based on the press releases, he and his assignors purchased additional Centurion stock and decided not to sell stock already owned.  Id.

On August 9, 2005 plaintiff contacted Leslie Richardson, an employee of MCC Financial, to ask whether the August 1, 2005 press release was accurate.  Ms. Richardson confirmed that "the

---

[2]  AIM (Alternative Investment Market) is the London Stock Exchange's international market for smaller growing companies.

Company has signed an irrevocable agreement." <u>Id.</u> Defendants issued another press release on August 11, 2005 stating:

> the buy-out process with the U.K. listed company is going forward as planned. The buy-out is currently in the final stage of the due diligent [<u>sic</u>] process and is expected to be completed shortly. Once the due diligence process is finalized the Company will send out an official notice to shareholders with the full terms of the deal.

<u>Id.</u> at ¶ 17. On September 16, 2006 defendants issued a press release stating:

> Centurion...announced today that it is on track to close the buy-out...Centurion also added that it expects to complete the filing for its 10Q early next week. Once the 10Q has been submitted to the SEC, an announcement regarding the finality of the buy out will be issued along with the identity of the AIM listed Platinum company and full details of the transaction.

<u>Id.</u> at ¶ 18. The market price of Centurion's stock then rose in one day from 27¢ to 35¢ per share. <u>Id.</u>

On September 23, 2005, defendants issued a press release stating that Centurion was restructuring its Board of Directors and several members were stepping down. <u>Id.</u> at ¶ 19.

On September 27, 2005, a press release made public that a Form 8-K was filed for Centurion on July 26, 2005, and that "as of July 26, 2005, Centurion...entered into an agreement with Minmet Plc., a company incorporated in the Republic of Ireland whereby Minmet has agreed to make an offer to acquire all of the

-4-

capital stock of the Company." Id. at ¶ 20. Minmet was neither an "AIM listed Platinum company" nor listed on the "UK exchange," and on that day Centurion's stock price fell from 33¢ to 27¢ per share. Id. at ¶ 20. The next day, plaintiff contacted Laurel Moody (Managing Director of MCC Financial) to ask whether it was true that (as stated on September 16) the "announcement regarding the finality of the buy out will be issued along with the identity of the AIM listed Platinum company and full details of the transaction." Ms. Moody replied, "Yes this is a truthful statement." Id. at ¶ 21.

On September 29, 2005, Minmet issued a press release stating that "Minmet confirms that it has informed Centurion that it will not be proceeding with the Contemplated Transaction with Centurion on the basis laid out in the HOA [a non-binding heads of agreement]." Id. at ¶ 22. On December 8, 2005, defendants issued a press release with the headline "Centurion Gold Issues Corporate Statement to Shareholders," which stated

> During March of 2005, management of Centurion went to
> London with the express purpose of obtaining a listing
> on the London Stock Exchange's AIM market for the
> Company's Platinum deposits and in conjunction
> therewith to obtain the necessary capital to begin
> exploration and development operations. The intention
> was and has always been to return value to the
> shareholders of Centurion through two distinct ways.
> The Platinum Mines would become revenue producing
> which would enhance the value of the asset/s in

-5-

question in addition, the anticipated shares, which would result from the listing, would be distributed to Centurion shareholders.

During this time, and as a result of numerous meetings, the Company was introduced to Minmet. Minmet's Chairman was pleased with the idea of taking over the Platinum deposits and moving Minmet's listing from the Irish Stock Exchange over to the AIM. As negotiations progressed, Minmet decided it would be more advantageous for them to make an offer for the whole of Centurion. Both parties conducted extensive diligence in London and South Africa. Simultaneously, Minmet began the process of moving over to the AIM. As a result of the process, which took longer than initially anticipated, Minmet was not able to complete any purchase that would materially alter its business per the company's filing for the AIM Exchange. Moreover, the same rules precluded Centurion from disclosing Minmet's name and details.

The delay gave both parties time to reevaluate the terms of the agreement and, although the initial agreement called for a price of $0.60 per Centurion share, both parties ultimately concluded not to proceed under the original terms. Management of Centurion decided that the best way to realize a higher return to the shareholders would be separate listings of, or spinning off the Company's various assets individually. Centurion's management looks forward to working with Minmet on a project by project basis.

Id. at ¶ 23.

At the time of that press release, Centurion's stock was trading at 14¢ per share.  Id. at ¶ 24.  As of March 14, 2006, Centurion's stock was trading at 11¢ per share.  Id. at ¶ 25.

Plaintiff claims that had Minmet purchased Centurion for 60¢ per share, plaintiff's and his assignors' shares would have

been worth $1.2 million in total. Id. at ¶ 26. The amended complaint seeks compensatory and punitive damages.


## DISCUSSION

On such a motion to dismiss a complaint, the court must accept its factual allegations as true, and draw all inferences in favor of the plaintiff. Mills, 12 F.3d 1170 at 1174; In re Bayer AG Sec. Litig., 423 F. Supp. 2d 105, 110 (S.D.N.Y. 2005). The court may consider exhibits annexed to the complaint or incorporated in it by reference. Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993). The complaint may be dismissed only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).


## Standing

Defendants argue that plaintiff does not adequately allege that he has standing to maintain this action on the assignors' behalf. Plaintiff provides affidavits from each assignor stating that he or she assigned his or her claims to plaintiff. For the purposes of a motion to dismiss, drawing all inferences

in favor of the plaintiff, plaintiff's claim that he has standing to represent the assignors is accepted.


## Alter-Ego

Plaintiff alleges that Moore Clayton and MCC Financial operate as one single corporate entity. Am. Cmplt. ¶ 28. In the amended complaint, plaintiff states that defendants "work out of the same offices, are controlled by similar personnel and/or corporate officers and operate email domain addresses under the domain name 'mccglobal.com'". Id. Drawing all inferences in favor of the plaintiff, the amended complaint contains sufficient allegations to allow the claims against both defendants to proceed.


## Federal Securities Fraud Claim

The amended complaint asserts a claim for federal securities fraud. To state a cause of action under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, "a plaintiff must plead that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and

that plaintiff's reliance on defendant's action caused [plaintiff] injury." Chill v. Gen. Elec. Co., 101 F.3d 263, 266 (2d Cir. 1996) (quoting Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995)).

Plaintiff alleges that defendants published press releases containing "materially false statements of fact and/or omissions of fact that would have made such statements not misleading." Am. Cmplt. ¶ 32. He alleges that the misstatements are attributable to defendants because they prepared the press releases. Id. at ¶ 7 ("MCC will increase awareness of Centurion Gold through investment community introductions in road shows and conference calls; media placement in financial, local, and trade media; and preparing and disseminating collateral materials to investors and media"). Additionally, plaintiff alleges that defendants "(i) admitted that the statements in the Press Releases were their own; and/or (ii) adopted the statements in the Press Releases as their own". Id. at ¶ 27. Drawing all inferences in favor of the plaintiff, the amended complaint adequately pleads that the statements are attributable to the defendants.

Defendants argue that plaintiff does not adequately plead scienter with respect to the misstatements. Plaintiff alleges

-9-

that defendants published the press releases with the knowledge that they contained false information. <u>See</u> Am. Cmplt. ¶ 37 ("committed intentionally and with a deliberate and/or reckless indifference to making an accurate, fair, balanced and non-misleading presentation"), ¶ 43 ("The material misrepresentations by the Defendants described above, which Plaintiff relied to his detriment, were fraudulent, and made with the intent to mislead the investing public"), ¶ 44 ("Defendants' intent to deceive was deliberate").   The amended complaint points to statements in the August 1 and August 11, 2005 press releases that the purchaser was "a UK listed company" and in the September 16, 2005 release that it was "AIM listed," neither of which were true.[3]

Plaintiff also alleges that defendants' employees knowingly made false statements in e-mails.  <u>Id.</u> at ¶¶ 31, 33 ("Minmet's offer letter to Centurion unequivocally shows that the offer was most certainly not 'irrevocable'" and "As of the date of her email, Ms. Moody knew that Minmet was not an AIM listed Platinum company -- yet intentionally lead Mr. Berk to believe otherwise").   On August 18, 2005 and September 28, 2005, Ms. Moody sent e-mails affirming the statement that the company was

---

[3] According to the September 27, 2005 press release, Centurion's agreement with Minmet was signed on July 26, 2005.  Am. Cmplt. Ex. K.  One can infer its listing status was known then.

"on the UK stock exchange" (<u>id.</u> at Ex. Q, Ex. L), in apparent conflict with her September 27, 2005 e-mail statement that it "will be moving to AIM" (<u>id.</u> at Ex. U), all of which turned out to be untrue. Those statements clearly purport to be made by someone with knowledge. It may be that Ms. Moody knew nothing of the facts she was expressing, or was innocently misinformed, but those are matters of defense. The pleading suffices to make the allegation.

Further, the amended complaint also pleads motive and opportunity to commit fraud. <u>Id.</u> at ¶ 44 ("Defendants' motive to defraud the investing public (and the Investors in particular) was fueled by its intent to drive up Centurion's stock price because Defendants' had received three hundred thousand (300,000) shares of Centurion's common stock in consideration for its agreement to handle Centurion's public relations").

<u>Reliance</u>

Defendants argue that plaintiff does not sufficiently plead reliance. In the amended complaint, plaintiff alleges that he and his assignors relied on defendants' statements in their decision to buy and hold Centurion stock. Am. Cmplt. at ¶¶ 31,

-11-

34 ("The Investors relied on Defendants' misrepresentations and omissions (contained in both the aforementioned Press Releases and e-mails from Defendants) to the [sic] their detriment"), Ex. O, Ex. P. Plaintiff's and his assignors' affidavits attached to the amended complaint affirm their reliance on the e-mails and press releases in their decisions to buy and keep Centurion stock. Id. at Ex. O, Ex. P. Drawing all inferences in favor of the plaintiff, the amended complaint adequately pleads reliance.

<u>Loss Causation</u>

In order to establish loss causation, a plaintiff must allege "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005) (internal citations omitted) (emphasis in original). Plaintiff alleges that the announcement that Centurion entered an irrevocable agreement with an AIM listed Platinum company caused Centurion's stock price to rise, and that when Minmet (a non-UK and non-AIM listed company) was

revealed as the proposed purchaser and the purchase fell through, Centurion's stock price dropped.

Plaintiff alleges that he and his assignors purchased and kept Centurion shares after the press releases stated that an AIM listed company would purchase Centurion. Because of the drop in Centurion's stock price when it became public that the purchasing company was not AIM listed and the acquisition would not go forward, they suffered losses. The amended complaint adequately pleads loss causation with respect to the press releases, and the claim can go forward.


<u>State Law Claims</u>


A. Common Law Fraud and Fraudulent Misrepresentation

To state a claim for fraud and fraudulent misrepresentation, a plaintiff must plead that "(1) the defendant made a material false representation; (2) the defendant intended to defraud the plaintiff thereby; (3) the plaintiff reasonably relied upon the representation; and (4) the plaintiff suffered damage as a result of such reliance." <u>Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.</u>, 157 F.3d 933 (2d Cir. 1998); <u>Am. Home Assurance Co. v. Gemma Constr. Co.,</u>

-13-

<u>Inc.</u>, 713 N.Y.S.2d 48, 53 (1st Dep't 2000).  As stated above, the amended complaint meets each of those requirements.


B.  Negligence and Negligent Misrepresentation

Plaintiff also asserts a claim for negligence and negligent misrepresentation.  However, New York's Martin Act bars private claims of negligent misrepresentation arising out of the sale of securities.  <u>Nanopierce Tech., Inc. v. Southridge Capital Mgmt.</u> <u>LLC</u>, 2003 WL 22052894, at *2-*4 (S.D.N.Y. Sept. 2, 2003).  The New York Court of Appeals and three of the Appellate Divisions have held that "allowing private litigants to press common law claims 'covered' by the Martin Act would upset the Attorney General's exclusive enforcement power in exactly the same way that it would upset the exclusive enforcement power to allow private claims pleaded under the Martin Act itself."  <u>Id.</u> at *1-*2.  The Second Circuit and federal district courts have also determined that the Martin Act preempts common law negligence claims involving securities.  <u>Id.</u> at *3.  <u>Scalp v. Blade</u>, 722 N.Y.S.2d 639 (4th Dep't 2001), relied on by plaintiff, and one other case following it "stand as solitary islands in a stream

of contrary opinion." Nanopierce Tech., Inc., 2003 WL 22052894 at * 3-4.

Plaintiff's negligent misrepresentation claim is preempted by the Martin Act, and is therefore dismissed.

### CONCLUSION

The motion to dismiss the claims of federal securities fraud, common law fraud, and fraudulent misrepresentation is denied.  The motion to dismiss the state law claim of negligence and negligent misrepresentation is granted.

So ordered.

DATED:    New York, New York
          December 11, 2006

                                   Louis L. Stanton
                              _____
                              LOUIS L. STANTON
                                   U.S.D.J.

-15-